IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| MICHAEL KEVIN ABNEY, ) | Case No. 15-60501 |
| ) | |
| Debtor. ) | |
| ) | |
| MICHAEL KEVIN ABNEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 15-6027 |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF EDUCATION, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Debtor Michael Kevin Abney seeks a determination that repayment of his student loans will impose an undue hardship upon him and his dependents and that the loans should therefore be discharged pursuant to 11 U.S.C. § 523(a)(8). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons that follow, the Court finds that the Debtor has met his burden under § 523(a)(8) and that judgment should be entered in his favor, discharging his student loans.

**The Debtor's Student Loans**

The Debtor incurred his student loans while attending school at Missouri Southern State University from the spring of 1994 to the fall of 1998. He incurred a total of approximately $25,000 in student loans, which are now consolidated. He

did not graduate. He testified that the monthly payment at the time he left school was about $210 per month, and that he defaulted early in the loan history. However, in about 2001, he brought the loans out of default by paying $1,600 and then began to make the $210 monthly payments. He had at least one deferment after 2001, but made a total of about $11,000 in payments before he defaulted again in January 2008. As of August 2015, the Debtor owed $37,243.28 in principal and interest on the consolidated student loans.

## Standard for Discharge of Student Loans

Section 523(a)(8) provides an exception to discharge for student loans unless the debtor is able to prove that excepting such debt from discharge would impose an undue hardship on the debtor and the debtor's dependents. In the Eighth Circuit, courts apply a totality-of-the-circumstances test in determining whether a student loan should be discharged.[1] Under this test, courts must consider the debtor's past, present, and reasonably reliable future financial resources; the debtor's reasonable and necessary living expenses; and any other relevant facts and circumstances.[2] The debtor has the burden of proving undue hardship by a preponderance of the evidence.[3] The burden has been described as "rigorous": if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt – while still allowing for a minimal standard of living –

---

[1] *In re Nielsen*, 473 B.R. 755, 758-59 (B.A.P. 8th Cir. 2012), *aff'd* 502 Fed. Appx. 634 (8th Cir. 2013). *See also In re Long*, 322 F.3d 549, 554-55 (8th Cir. 2003) (confirming that the Eighth Circuit uses the "less restrictive approach" embraced by the totality-of-the-circumstances approach, rather than the *Brunner* test used by many other courts; referring to *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987)).

[2] *Id.* at 759 (quoting *Educ. Credit Mgmt. Corp v. Jesperson*, 571 F.3d 775, 779 (8th Cir. 2009)).

[3] *Id.* (quoting *Jesperson*, 571 F.3d at 779).

2

then the debt should not be discharged.[4]  And, while the availability of an income contingent repayment plan is not determinative as to undue hardship, it is an important factor in the Eighth Circuit.[5]

## The Debtor's Past, Present, and
## Reasonably Reliable Future Financial Resources

The Debtor (who appeared *pro se*) is forty years old and is unmarried.  He is currently employed as a delivery driver, but at times in the past, he has worked as an over-the-road truck driver.  He currently earns gross regular income of $2,420 per month, plus overtime in the approximate amount of $643 per month, for a total gross monthly income of approximately $3,063 per month.  After payroll deductions for taxes, a modest retirement contribution, insurance, and child support, discussed below, his net take-home pay is approximately $1,183.[6]  The Debtor testified that, due to Department of Transportation limitations on hours of service,[7] he is unable to earn any more than what he is currently earning with the overtime, even if he took a second driving job.  He also testified without contradiction that he has no job skills other than as a driver.  He testified he had made more money as an over-the-road truck driver, but that his expenses were also higher then.  In addition, the Debtor's ex-wife testified that some of the litigation concerning visitation with his son, discussed more fully below, was premised on the Debtor's being out on the road.  The implication was that driving on-the-road adversely affects the Debtor's visitation privileges.  The Debtor currently makes a

---

[4] *Id.* (quoting *Jesperson*, 571 F.3d at 779).

[5] *Id.* at 761.

[6] *See* Debtor's Exhibit 14, itemizing the Debtor's income and expenses at the time of the trial.

[7] *See* Debtor's Exhibit 21.

voluntary contribution of $62 per month toward a retirement plan through his employer,[8] but has only saved about $540 in a 401k.[9] He has no other retirement savings.

Based on the evidence and testimony, I find that the Debtor is maximizing his earnings potential, and that it is not likely that his financial resources will improve significantly in the future.

### The Debtor's Living Expenses

The Debtor has two children: an eleven-year-old son, and a seven-year-old daughter. He pays child support to the mother of his son (his former wife) in the amount of $450 per month, and to the mother of his daughter in the amount of $350 per month. He is also paying an additional $288.46 per month to cure child support arrearages, for total child support payments of $1,038.46 per month, which is being deducted from his paycheck, as mentioned above. He expects to cure the arrearage by the end of the year, which will reduce the total monthly child support deduction to the original $750 amount. The Debtor testified that he has been involved in protracted litigation with the mothers of his children over visitation and custody issues and expects that litigation to continue in the future. It was readily evident at the hearing that the Debtor wishes to have meaningful relationships with his children and that he is making every effort to make his child support payments, discussed more fully below.

In December 2008, the Debtor lost his home to foreclosure, at which time he moved into his parents' home, where he lived until December of 2009.[10] He then

---

[8] *See* Debtor's Exhibit 14.

[9] *See* Defendant's Exhibit 12 (paystub showing year-to-date contributions to the 401k); Amended Schedule B, Doc No. 26 in the Debtor's main bankruptcy case (showing a $300 balance in the employer's 401k).

4

lived in a rental home from January 2010 through November 2012. From November 2012 through May 2013, the Debtor lived out of the cab of his employer's over-the-road truck, he testified, in an effort to reduce expenses. In May 2013, he moved into a homeless shelter, where he stayed until October of 2013. At that point, he began again living out of the cab of his employer's truck, until May of 2014, at which time, he moved back into the homeless shelter, where he stayed for a year, until May 2015. In May 2015, which was about the time of the filing of this bankruptcy case, the Debtor rented a studio apartment for $640 per month.[11] The evidence showed that, except for a few months following his hospitalization, discussed below, the Debtor was generally employed during the times he lived out of the trucks and homeless shelter,[12] and he testified he did not rent a residence during those times in order to save expenses. While not necessary to the decision here, it was at least suggested at trial that the Debtor's living arrangements may have at times cost him visitation privileges.

The Debtor's other expenses are modest. In addition to the $640 in rent for the studio apartment (which apparently includes utilities), he lists $50 for telephone; $221 for food and housekeeping supplies; $5 for childcare and children's education costs; $54 for clothing, laundry, and dry cleaning; $260 for medical and dental expenses; $30 for transportation; $35 for charitable donations; and $86 for a gym membership and storage unit.[13]

---

[10] I note that included in his unsecured debts is what appears to be a foreclosure deficiency in the amount of $57,000 to Bank of America.

[11] *See* Debtor's Exhibit 1 (a list of the Debtor's residential addresses).

[12] *See* Debtor's Exhibit 2 (the Debtor's employment history).

[13] *See* Debtor's Exhibits 14 (list of income and expenses) and Exhibit 15 (receipts for rent, food and household goods, prescriptions, and gym membership for the month of September).

With regard to the medical expenses, the Debtor was hospitalized at the Mercy Marian Center for Behavioral Health for seven days, from June 6, 2013 through June 12, 2013.[14] The Debtor testified that, beginning in about May 2013, he began to suffer extreme stress and depression as a result of the litigation involving his children and the dismissal of a Chapter 13 bankruptcy case he was in at the time. Also recall, the Debtor was living out of his employer's truck and then a homeless shelter at that time. Although the Debtor's official diagnosis was identified as a "mood problem," the doctor's notes on his discharge papers indicate that his condition was "more likely depression than bipolar disorder."[15] The Debtor was placed on depression-related medications at that time, which he continues to take under the care of a medical doctor. The Debtor applied for social security disability benefits at around the time of his hospitalization, but eventually dropped his pursuit of that claim.[16] As stated, the Debtor is now able to work, with the help of his medications. The Debtor has health insurance, the premium for which is deducted from his paycheck, discussed above. The $260 in medical expenses are essentially the after-insurance co-payments for his prescription medications.[17]

The Debtor testified that he spends about $41 per month for a gym membership, which he requires because his job involves the loading and unloading of a delivery truck and he must be in a physical condition necessary for that kind of work. He spends about $45 per month on a storage unit because his studio apartment is too small to hold many of his belongings.

---

[14] *See* Debtor's Exhibit 13.

[15] *Id.*

[16] *Id.*

[17] *See* Debtor's Exhibit 15 (receipts for prescription medications for the month of September 2015).

The Debtor claims only $30 in transportation expenses. He testified that he does not own a car. Because busses do not run during the middle of the night in Springfield, Missouri, he rides a bicycle four-and-a-half miles to work at 3:00 a.m., regardless of the weather. He understandably would like to buy a car, but he cannot afford to do so and pay his child support.

After paying his expenses, the Debtor's monthly budget is negative $203.[18] Thus, assuming the Debtor succeeds in paying off the $288.46 child support arrearage by the end of 2015, he will have approximately $85 per month left after expenses, which is insufficient to purchase, operate, and maintain a vehicle.

"To be reasonable and necessary, an expense must be 'modest and commensurate with the debtor's resources.'"[19] "[A] minimal standard of living requires that the debtor have sufficient financial resources to satisfy needs for food, shelter, clothing and medical treatment."[20] I find that the Debtor's expenses are, indeed, modest and commensurate with his resources, and that he is very frugally (in fact, barely) meeting his needs for food, shelter, clothing, and medical treatment. He claims no expenses whatsoever for items such as eating out, entertainment, pets, cigarettes, and the like. He does not even own a car. I find that the Debtor's expenses are, therefore, reasonable and necessary for a minimal standard of living.

---

[18] *See* Exhibit 14.

[19] *In re Nielsen*, 473 B.R. at 760 (quoting *Jesperson*, 571 F.3d at 780).

[20] *Id.* (citation omitted).

**Other Relevant Facts and Circumstances**

Courts in the Eighth Circuit have looked to a number of other facts and circumstances – besides present and future income and expenses – to assist them in determining undue hardship. Such factors include:

> (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness.[21]

I find that those factors weigh heavily in favor of a finding of undue hardship. The Debtor has made substantial payments, in the amount of approximately $11,000, on the original loans totaling approximately $25,000. He was able to negotiate a deferment of payment, and complied in good faith with the terms of that deferment. He was not able to complete the deferred payments because, he testified, he could not afford to pay for the litigation and child support, while also maintaining his student loan payments.

As seen, the Debtor has made a good faith effort to maximize income and minimize expenses. The Debtor did not specifically testify as to whether discharge of the student loans was a dominant purpose in filing the bankruptcy case.

---

[21] *McLaughlin v. U.S. Funds* (*In re McLaughlin*), 359 B.R. 746, 750 (Bankr. W.D. Mo. 2007), as quoted in *Jesperson*, 571 F.3d at 783-84 (Smith, J. concurring).

However, his Schedule F lists unsecured nonpriority debts totaling $116,617, which does not include the student loan debt, plus an additional $16,879 owed to a bank (apparently mistakenly listed as a priority debt in Schedule E). These debts include significant medical debts, and a deficiency owed to Bank of America, as well as attorneys' fees, apparently owed for the ongoing child support and visitation litigation the Debtor testified to. I find that the student loans were not a dominant purpose of the Debtor's bankruptcy filing.

## The Income-Based Repayment Program

The linchpin of the Department's argument is that the student loans should not be discharged because the Debtor is eligible for the Department's Income-Based Repayment Program for student loans (the "IBRP"). While the Department acknowledges that the Debtor's payment under such program would be zero based on his current income, it essentially argues that he should be required to participate in that program in the hope that his circumstances might change. The Eighth Circuit has held that "a student loan should not be discharged when the debtor has 'the ability to earn sufficient income to make student loan payments under the various special opportunities made available through the student loan program.'"[22] But whether the debtor is enrolled in such a payment program is "merely a factor to consider" in determining undue hardship.[23] Here, the debtor has demonstrated that there is little likelihood of his being able to make significant payments under the IBRP. For that, and other reasons to be explained, I find that the IBRP option is entitled to little weight in determining undue hardship here.

---

[22] *Jesperson*, 571 F.3d at 781 (citation omitted).

[23] *Id*., 571 F.3d at 783 (Smith, J. concurring) (internal quotation marks omitted).

The representative from the Department of Education testified that, because the Debtor is in default on his student loans, he would first need to "rehabilitate" the loans in order to participate in the IBRP. Under this rehabilitation program, the Debtor would be required to make nine voluntary payments based on his income level, but no less than $5. After nine months of successful payments, the loan would be transferred to a servicer, at which time the Debtor could be eligible for programs including deferments, forbearances, and an IBRP plan.

The IBRP allows for forgiveness of student loans if the borrower makes monthly payments equal to 15% of discretionary income for a period of 25 years after acceptance into the program.[24] For IBRP purposes, discretionary income is defined as the difference between 150% of the applicable HHS poverty guideline and the borrower's current income. In the Debtor's case, 150% of the poverty guideline for a family of three is $30,135 annually ($2,511.25 monthly), so 15% of all of the Debtor's income above that amount would be owed in monthly payments. The payment amount is computed yearly, based on the prior year's income, without reference to the borrower's expenses.[25]

The Department acknowledges that the Debtor's payment under the IBRP at this time would be zero because his 2014 income tax return showed an AGI of

---

[24] *See* 20 U.S.C. § 1098e; 34 C.F.R. § 682.215 and § 685.221. Note that, for any loan made to a new borrower on or after July 1, 2014, forgiveness occurs if the borrower makes monthly payments for twenty years, equal to 10% of discretionary income. 20 U.S.C. § 1098e(e).

[25] *See* 34 C.F.R. §§ 685.209, 685.221. *See also In re Ayele*, 468 B.R. 24, 26-27 (Bankr. D. Mass. 2012) ("Under the IBR, the amount an eligible borrower would repay each month . . . is based on the Borrower's AGI and family size. The annual IBR repayment amount is 15 percent of the difference between the borrower's AGI (or an alternate income amount) and 150 percent of the Federal HHS Poverty Guidelines, adjusted for family size. That amount is then divided by 12 to get the monthly IBR repayment amount. If that amount is higher than the 10–year standard repayment amount on the borrower's loans, then the borrower's required payment is the standard amount. The repayment amount under a 10–year standard plan is calculated based upon the total.").

$26,405, which is below the 150% poverty guideline. Based on the Debtor's work history and education, there is no basis to find that this situation is reasonably likely to change in the foreseeable future. Of course, the Debtor will not be required to pay child support forever, and that would free up some of his income, but the Debtor has no car or savings for retirement. At some point, he should be permitted to invest a modest amount in those things. Further, the Department's witness testified, interest continues to accrue on the loans, such that the balance will only increase over the next 25 years. Nevertheless, despite the fact that the Debtor is unlikely to make any meaningful dent in the debt, the Department argues that the mere availability of the IBRP negates any finding of undue hardship.

    I disagree. Holding that eligibility for a program such as IBRP *ipso facto* leads to denial of an undue hardship discharge would deprive the Court of the discretion granted by § 523(a)(8).[26] Fortunately for debtors in the Eighth Circuit, eligibility for IBRP is just one factor in judging dischargeability, and is not determinative.[27] The issue, then, is how much weight to give to that factor in a particular case.

---

[26] *See, e.g.*, *Krieger v. Educ. Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013) (holding that, if good faith entails a commitment to future efforts to repay, then no educational loan could *ever* be discharged because it is always possible to pay in the future should prospects improve, but § 523(a)(8) does not forbid discharge, and "[i]t is important not to allow judicial glosses . . . to supersede the statute itself."); *Jesperson*, 571 F.3d at 787 (Bye, J., dissenting) ("[P]lacing undue weight on a debtor's ability to qualify for the [IBRP] improperly limits the inherent discretion afforded to bankruptcy judges when evaluating requests for § 523(a)(8) relief, and reduces the totality-of-the-circumstances test to a simple arithmetical calculation.").

[27] *Nielsen v. ACS, Inc. Educational Credit Management Corporation*, 502 Fed. Appx. 634, 635 (8th Cir. 2013) ("We further conclude that the bankruptcy court did not err in considering Neilsen's eligibility for the [IBRP] as one factor in its analysis."), *affirming In re Nielsen*, 473 B.R. at 761 and n.5; *In re Jesperson*, 571 F.3d at 784 (Smith, J. concurring) (stating that, while the [IBRP] is a factor relating to good faith in the analysis, a bankruptcy court should not place too much weight on the debtor's refusal to enroll in the [IBRP]; *Id.* at 786 (Bye, J., dissenting) (writing separately "to emphasize that, in accordance with the overwhelming

In determining how much weight to give to eligibility for IBRP, a court, contrary to the Department's position, must be mindful of both the likelihood of a debtor making significant payments under the IBRP, and also of the additional hardships which may be imposed by these programs. As stated, interest and other charges would continue to accrue while the Debtor participated in IBRP, meaning that the total debt would be increasing. The overhang of such debt could well impact not only the Debtor's access to credit over the 25-year IBRP period, but could also affect future employment opportunities and access to housing.[28] And, decades of mounting indebtedness, even with a zero or minimal payment amount, can impose a substantial emotional burden as well.[29] Indeed, in the Debtor's case, the evidence showed that he has already suffered emotionally from his ongoing debt struggles and was in fact hospitalized in part because of it.

Furthermore, borrowers who default while in an IBRP program lose eligibility.[30] For someone with the Debtor's income, and of his age, an inability to make one month's payment over a 25-year year period is highly likely, given the possibility of medical conditions leading to additional expenses and loss of income, as well as other short-term financial emergencies encountered by those with nothing to fall back on.

---

majority of courts, a debtor is not ineligible for a hardship discharge if capable of making payments under the [IBRP].").

[28] *See, e.g.*, *In re Strand*, 298 B.R. 367, 376 (Bankr. D. Minn. 2003).

[29] *See Reynolds v. Pennsylvania Higher Educ. Assistance Agency* (*In re Reynolds*), 425 F.3d 526, 532-33 (8th Cir. 2005) ("Where the evidence shows that financial obligations are likely to undermine a debtor's health, which in turn will affect the debtor's financial outlook, we think it entirely consistent with *Andrews* and *Long* to take such facts and circumstances into account. We will not adopt an interpretation of 'undue hardship' that causes the courts to shut their eyes to factors that may lead to disaster, both personal and financial, for a suffering debtor.").

[30] *See* 34 C.F.R. §§ 685.221(a)(2), 685.209(a)(ii), 685.215(a)(2).

And, even if the Debtor were able to navigate the 25-year program without a misstep, he could well then be faced with a significant tax debt when the debt is forgiven. To explain, discharge of a debt in bankruptcy is not itself a taxable event. However, forgiveness of a student loan at the end of the IBRP period is taxable in the same way as forgiveness of any other debt outside bankruptcy. That is, to the extent a debtor's assets exceed liabilities after the forgiveness, the forgiven debt is taxable income. Thus, if the Debtor were able over the next 25 years to timely pay his IBRP payments, as well as pay his child support and other expenses, and to somehow accumulate reserves to fall back on for retirement or otherwise, he would then be rewarded with a tax bill based on the amount of principal, interest and other charges owed to the Department at the time of forgiveness, when the Debtor is likely to be at least 65 years old. In contrast, discharge of his student loans in bankruptcy would give the Debtor the opportunity to use his fresh start to support his children and improve his financial situation before he is too old to do so. While "the mere possibility of tax consequences at the expiration of the 25-year repayment period is not *dispositive* of the issue of whether the [IBRP] represents a viable avenue for repayment of the student loan debt,"[31] it is a factor which may and should be considered based on the facts of a particular case**.**[32] Here, because of the Debtor's age, as well as the physical

---

[31] *In re Nielsen*, 473 B.R. at 762 (emphasis added, citation omitted).

[32] *See, e.g.*, *Marshall v. Student Loan Corp.* (*In re Marshall*), 430 B.R. 809, 815 (Bankr. S.D. Ohio 2010) ("At the end of the 25–year repayment period, if the debt is cancelled, there are tax consequences for the Debtor. The Debtor would be 81 years old at the end of the 25–year repayment period, and likely still on a fixed income. The tax consequences for someone in that position could be devastating. The existence of the IBR cannot obliterate the Code's policy of a fresh start." (citations and internal quotation marks omitted)); *In re Todd,* 473 B.R. 676, 695 n. 28 (Bankr. D. Md. 2012) ("Participation in the [IBRP] could also have serious tax consequences for Ms. Todd that would negate the program's superficial solution."); *In re Durrani*, 311 B.R. 496, 508 (Bankr. N.D. Ill. 2004) (holding that the court must consider the considerable tax burden that will be borne by a debtor if he participates in the IBRP and further noting that the tax

requirements of his job, it is likely that he will be retired, or close to it, when the 25-year IBRP term is completed. At that point, assuming he has fulfilled his child support and student loan obligations, he would either be left with no assets for extraordinary expenses of his later years, or a tax bill to the extent he has accumulated any such assets. Either way, given his limited ability to earn additional income, repayment of the loans would effectively bar the Debtor from putting away anything meaningful for his later years.

Against these additional hardships from participation in IBRP, a court should consider the reasonable prospect that the borrower will be able to make "significant" payments while in the program.[33] If, based on a borrower's education and earning potential, a court is able to conclude that there is a reasonable prospect of an upswing in income sufficient to make significant payments under IBRP, or if the inability to pay is a temporary one,[34] or if the debtor's reduced income is due to lifestyle choices,[35] the burdens imposed by participation in IBRP may well be justified. As with all elements of the undue hardship analysis, the debtor has the

---

due at the end of the IBRP "exchange[s] one huge nondischargeable debt for educational loans for another in the form of nondischargeable income taxes") (citation omitted).

[33] *See Jesperson*, 571 F.3d at 778 ("The issue, as we perceive it, is whether a recent law school graduate who is reasonably likely to be able to make significant debt repayments in the foreseeable future, and who qualifies for the [IBRP], is entitled to an undue hardship discharge . . . .").

[34] *See In re Brondson*, 435 B.R. 791, 802 (B.A.P. 1st Cir. 2010).

[35] *See, e.g.*, *In re Nielsen*, 2013 WL 2299626 (Bankr. S.D. Iowa May 24, 2013) (holding that self-imposed work limitations and choosing to repay family members rather than student loans was a factor in holding the student loans were nondischargeable), *aff'd* 518 B.R. 529 (B.A.P. 8th Cir. 2014); *In re Brooks*, 406 B.R. 382, 389 (Bankr. D. Minn. 2009) ("Personal lifestyle decisions which reduce a debtor's income must also be evaluated by the Court in determining earning capacity.") (citation and internal quotation marks omitted); *In re Shadwick*, 341 B.R. 6, 10 (Bankr. W.D. Mo. 2006) ("[I]t is clearly not enough for a debtor simply to demonstrate that payment of a student loan would require a readjustment of his financial situation or a diminution in lifestyle. A debtor is therefore not entitled to maintain the standard of living enjoyed before the filing of the petition.").

burden of showing that there is not a reasonable prospect of a significant change in his financial situation.[36]  For the reasons stated, I find that the Debtor has so shown.

## Conclusion

Based on the foregoing, I find that the Debtor has proven, by a preponderance of the evidence, that not discharging his student loans would impose an undue hardship on him and his dependents.  He is maximizing his earnings potential; indeed, the evidence was that he works as much overtime as regulations permit.  I further find that his future financial resources are not likely to improve significantly, and he has essentially no savings for retirement.  His expenses are exceptionally modest.  I further find that, despite the fact that the child support payments will end at some point, the Debtor should be afforded the opportunity to buy a car and save at least something for retirement, something he would not likely be able to do if he is required to make student loan payments.  Furthermore, the Debtor has made good faith efforts to defer his obligations, and to make payments under deferral agreements.  And, based on the amount of other debt being discharged, he has good and sufficient reasons for filing bankruptcy apart from his student loans.

In sum, the Debtor has made every humanly-possible effort to pay his child support and student loans, to the point of riding a bicycle to work and living out of his employers' trucks and homeless shelters for periods of time.  In addition, the mere availability of the IBRP is of no help to the Debtor's current or future situation but, rather, imposes additional burdens on him.  Undue hardship should

---

[36] *In re Long*, 322 F.3d at 554-55 (the determination requires consideration of the "prospect of future changes – positive or adverse – in the debtor's financial position.").

not be interpreted so harshly as to prevent this debtor – who is acting in good faith to fulfill his obligations – from ever getting the fresh start that the Bankruptcy Code is intended to provide.

As a result, the Debtor has met his burden of proving that the repayment of his student loans imposes an undue hardship on him, and that they should, therefore, be discharged pursuant to 11 U.S.C. § 523(a)(8). An Order in accordance with this Memorandum Opinion will be entered this date.

Dated: 11-10-2015

/s/ Arthur B. Federman
Chief Bankruptcy Judge

Court to serve parties not receiving electronic notice